**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JASON J. ELLIS, | ) | CASE NO. 3:14-CV-02336 |
| | ) | |
| Plaintiff, | ) | JUDGE HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | | |

Plaintiff, Jason J. Ellis ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act ("Act"), 42 U.S.C. §§ 423, 1381(a).  This Court has jurisdiction pursuant to

42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be AFFIRMED.

## I.    PROCEDURAL HISTORY

Plaintiff previously applied for Social Security Disability Insurance benefits on

September 1, 2004, but his claim was denied at the reconsideration level on July 27,

2005. (Transcript ("Tr.") 50.)  Thereafter, Plaintiff's request for a hearing was dismissed

for abandonment on July 12, 2007.  (*Id.*)

On November 22, 2010, Plaintiff protectively filed an application for SSI, alleging

a disability onset date of May 15, 2001.[1]  (*Id.*)  Plaintiff's claim was denied initially and upon reconsideration, and he requested a hearing before an administrative law judge ("ALJ").  (*Id.*)  On December 28, 2012, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On February 4, 2013, the ALJ found Plaintiff not disabled.  (Tr. 47.)  On August 21, 2014, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)

On October 20, 2014, Plaintiff filed his complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this matter.  (Doc. Nos. 13, 14, 20.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a Listing; and (2) the ALJ erred in evaluating the opinion of Plaintiff's treating psychiatrist, Dr. LaForrest.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born in June 1972 and was 38-years-old on the date he filed his application.  (Tr. 61.)  He had at least a high school education and was able to communicate in English.  (*Id.*)  He had past relevant work as a furniture repairer.  (*Id.*)

---

[1]  Plaintiff later amended his alleged onset date to November 22, 2010.  (Tr. 50.)

B.   **Medical Evidence**

1.   **Medical Reports**

i.   **Cardiac Condition**

In November 2010, Plaintiff had a consultation with physicians due to chest pain he experienced after presenting to the emergency room earlier that week with similar complaints.  (Tr. 576.)  Plaintiff was found to have significant multivessel coronary disease, with an ejection fraction estimated at 15% and severe left ventricular dysfunction.  (*Id.*)  He was referred for surgical evaluation.  (*Id.*)  A few days later, Plaintiff had cardiac catheterization and coronary artery bypass grafting surgery.  (Tr. 579-581.)  He tolerated the surgery well without complications.  (Tr. 581.)  Following surgery, Plaintiff attended cardiac rehabilitation.  (Tr. 621-626.)  Echocardiograms indicated that Plaintiff had impaired blood flow, but he controlled his symptoms with medication.  (Tr. 616, 618-619, 806, 810.)  On March 2, 2011, Plaintiff reported that he had some incisional chest wall pain but was improving on a daily basis.  (Tr. 616.)  Brian Dolsey, M.D., reported that Plaintiff was doing "quite well."  (*Id.*)  Plaintiff's ejection fraction rate was 35%.  (Tr. 617.)  In June 2011, Plaintiff again reported that he was doing well and had no complaints.  (Tr. 806.)  He denied any chest pain or shortness of breath or any other symptoms relating to his heart.  (*Id.*)  A treatment note from June 10, 2011, indicated that Plaintiff's hypertension was very well controlled.  (Tr. 811.)

On February 20, 2012, Plaintiff underwent two exams that yielded two different ejection fraction rates.  (Tr. 1006-1007, 1008-1009.)  On one exam, Plaintiff's ejection

3

fraction rate was 34-45%. (Tr. 1006-1007.) On another exam, which tested Plaintiff's response to a stress test, his ejection fraction rate was 25%. (Tr. 1008-1009.) In October 2012, Plaintiff denied chest pain, shortness of breath, and other symptoms related to his heart condition. (Tr. 989.) He continued to take and tolerate all of his medication. (*Id.*) On examination, Plaintiff had regular heart rhythm and sounds without murmurs. (Tr. 990.) Plaintiff's physician noted that Plaintiff's coronary artery disease was asymptomatic. (*Id.*)

### ii.    Knee Condition and Rheumatoid Arthritis

Plaintiff received care for his knee at the Orthopaedic Network, Inc., and from Thomas Houston, M.D., between November 2010 and July 2011. (Tr. 856-875.) In February 2011, Plaintiff requested that doctors fill out paperwork for disability purposes with respect to Plaintiff's knee, ankle, and foot pain, but he left the doctor's office without being seen and refused to give an explanation as to why he was leaving. (Tr. 591-592.)

Plaintiff was diagnosed with chronic synovitis of the left knee. (Tr. 675.) He underwent surgery in May 2011 to address his knee pain, and treatment notes show that he tolerated the surgery well. (Tr. 644-645, 672-676, 871.) Two weeks after the surgery, there was still recurrent swelling in his knee which was treated with an elastic knee sleeve. (Tr. 869.) Treatment notes indicate that Plaintiff was "having very little in the way of discomfort." (*Id.*) In July 2011, Plaintiff began treatment at St. Luke's hospital for his ongoing complaints of knee pain. (Tr. 961-984.)

Plaintiff received treatment for his rheumatoid arthritis from Edward Goldberger,

4

M.D., beginning in March 2012.  (Tr. 911-931, 1023-1047.)  Treatment notes reflect that Plaintiff responded well to injections and anti-inflammatory medication.  (Tr. 911-931, 1027.)  He continued to have pain from arthritis. (Tr. 911-931.)  Dr. Goldberger prescribed methotrexate, which provided some relief.  (Tr. 1026.)  In December 2012, Plaintiff reported less swelling in the left knee but stated that it was still painful with ongoing catching and giving out.  (Tr. 1023.)

### iii.  Mental Condition

Plaintiff received treatment for his mental condition at the Zepf Center beginning in January 2012.  (Tr. 932-960.)  In March 2012, Barbara LaForrest, M.D., began treating Plaintiff for his mental health issues.  (Tr. 1019.)  In December 2012, Dr. LaForrest noted that Plaintiff had bipolar disorder, a Global Assessment of Functioning (GAF) score of 55,[2] and exhibited some improvement with medication.  (Tr. 1020.)

On December 3, 2012, Dr. LaForrest completed a questionnaire concerning Plaintiff's mental limitations.  (Tr. 1014-1017.)  She opined that Plaintiff had no limitation, to very mild limitation, in his ability to understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; ask simple questions or request assistance; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness/cleanliness; and be aware of normal hazards and take appropriate precautions.  (Tr. 1014-1017.)  Dr. LaForrest

---

[2]  The GAF scale incorporates an individual's psychological, social, and occupational functioning on a hypothetical continuum of mental health illness devised by the American Psychiatric Association.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

further opined that Plaintiff had moderate limitations in his ability to remember locations and work-like procedures; understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (*Id.*) Finally, Dr. LaForrest opined that Plaintiff had marked limitations in his ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*)

### 2. Agency Reports

Elaine Lewis, M.D., and Sarah Long, M.D., reviewed Plaintiff's medical records on behalf of the state agency. (Tr. 127-128, 145-146.) They opined that Plaintiff could lift/carry 10 pounds frequently and 20 pounds occasionally; stand/walk about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and would have various postural and environmental limitations. (*Id.*) Drs. Lewis and Long opined that Plaintiff did not meet a Listing. (*Id.*)

Plaintiff attended a psychiatric consultative examination at the request of the agency on February 10, 2011. B. Griffiths, Psy.D., evaluated Plaintiff and diagnosed

6

him with bipolar disorder, posttraumatic stress disorder, and marijuana dependence in early, full, sustained remission.  (Tr. 586.)  Plaintiff was agitated and restless, but his grooming and hygiene were adequate; he displayed no psychotic symptomatology; his remote recall was adequate; his short term memory fell in the average range; and he appeared to be of average intelligence.  (Tr. 583-585.)  Dr. Griffiths opined that Plaintiff's mental ability to relate to others including fellow workers and supervisors was markedly impaired; his mental ability to understand, remember, and follow simple instructions was not impaired; and his mental ability to maintain attention, concentration, persistence, and pace was moderately impaired.  (Tr. 586.)  Dr. Griffiths added that Plaintiff's ability to withstand the stress and pressure associated with day-to-day work activity was markedly impaired, and that Plaintiff may require assistance in managing funds given his previous history of illicit drug use. (Tr. 586-587.)

**C.      Hearing Testimony**

**1.      Plaintiff's Hearing Testimony**

Plaintiff testified that he lived alone, graduated from high school, and worked as a furniture repairer for a year or two.  (Tr. 75-77.)  He stated that he was unable to work due to his arthritis, heart condition, and bipolar disorder.  (Tr. 78.)  Plaintiff testified that he got winded, could only walk one block, and had difficulty stooping, bending, and squatting because his left knee did not bend.  (Tr. 78, 80.)  He further stated that he could not lift "a whole lot," and he could only sit for one hour.  (Tr. 80-81.)  Plaintiff testified that he had pain and numbness in his fingertips and he had difficulty writing. (Tr. 87-88.)  He stated that he saw a psychiatrist every three months for his bipolar

7

disorder. (Tr. 79.) He also stated that he had a counselor, Judy, who he saw once every two weeks, and a social worker, Tom, who he saw at least once per month. (Tr. 90.)

Plaintiff testified that he could go to the grocery store. (Tr. 82.) He stated that he could probably lift up to 20 pounds, but that doing so may cause him to lose his balance. (Tr. 83.) He testified that he did not use an ambulatory aid, but that it was suggested that he use a cane. (*Id.*) Plaintiff stated that he experienced swelling of his left knee despite medication, injections, and aspirations. (Tr. 86.) He further stated that he had angina and difficulty breathing, which was exacerbated by activity and cold, wet weather. (Tr. 94.)

Plaintiff testified that he could cook, make the bed, do laundry, and bathe himself, although he stated that he had some difficulty performing these activities. (Tr. 95-97.) Plaintiff could read, use the computer, and watch television. (Tr. 97.)

### 2. Vocational Expert's Hearing Testimony

A vocational expert testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience. (Tr. 102.) The individual could perform light work except that he would be limited to occasional climbing of ladders, ropes, or scaffolds; frequent climbing of ramps and stairs; and frequent kneeling, crouching, and crawling. (Tr. 102.) The individual must avoid moderate exposure to: extreme cold and heat; humidity; irritants such as fumes, odors, dust, and gases; and hazards such as moving machinery and unprotected heights. (*Id.*) The individual would be limited to work with simple, routine, and repetitive tasks as defined in the Dictionary of Occupational Titles (DOT) as specific

vocational preparation (SVP) levels 1 and 2. (*Id.*) The individual would be limited to having no interaction with the general public and occasional interaction with co-workers and supervisors. (*Id.*) The VE testified that the hypothetical individual would be capable of performing such jobs as an inspector and hand packager; a photocopy machine operator; and a small products assembler. (Tr. 103.)

## III. STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524 (6th Cir. 1981)*. A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905

9

F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since November 22, 2010, the application date.

2. The claimant has the following severe impairments: status-post left knee surgery; status-post coronary bypass grafting; bipolar disorder; obesity; anxiety disorder; substance addiction disorder; posttraumatic stress disorder; coronary artery disease; and rheumatoid arthritis.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant: is limited to occasional climbing of ladders, ropes, or scaffolds; is limited to frequent climbing of ramps and stairs; is limited to frequent kneeling, crouching, and crawling; must avoid moderate exposure to extreme cold, extreme heat, humidity, irritants, such as fumes, odors, dust and

gases, and hazards such as moving machinery and unprotected heights; is limited to work with simple, routine, and repetitive tasks as defined in the DOT (Dictionary of Occupational Titles) as SVP levels 1 and 2; is limited to no interaction with the general public; and is limited to occasional interaction with co-workers and supervisors.

5.    The claimant is unable to perform any past relevant work.

6.    The claimant was born in June 1972 and was 38-years-old, which is defined as a younger individual age 18-49, on the date the application was filed.

7.    The claimant has at least a high school education and is able to communicate in English.

8.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.   The claimant has not been under a disability, as defined in the Social Security Act, since November 22, 2010, the date the application was filed.

(Tr. 52-63.)

## V.  LAW & ANALYSIS

### A.    Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in

11

the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. *Id.* However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

### B. Plaintiff's Assignments of Error

#### 1. The ALJ Erred in Finding that Plaintiff Did Not Have an Impairment or Combination of Impairments that Met or Medically Equaled a Listing.

Plaintiff argues that the ALJ erred in finding that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Specifically, Plaintiff maintains that the ALJ erred in failing to find that Plaintiff's cardiovascular impairment met the criteria for Listings 4.02 and 4.04.[3]

---

[3] As the Commissioner notes in her Brief on the Merits, Plaintiff's Brief on the Merits offers a confusing array of arguments suggesting that Plaintiff met one or more of the listings related to cardiovascular impairment. (Plaintiff's Brief ("Pl.'s Br.") at 14-21.) In his Reply Brief, Plaintiff clarifies that his argument is that Plaintiff meets Listings

Plaintiff further argues that the ALJ did not properly consider Plaintiff's rheumatoid arthritis in determining whether Plaintiff satisfied a Listing.  Finally, Plaintiff raises the argument that the ALJ erred in failing to find that he met Listings 1.02 and 1.04 pertaining to musculoskeletal impairments.  The Court will address each of Plaintiff's arguments in turn.

### a.  Cardiovascular Impairment

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or medically equals one of the impairments in the Listings.  *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing 20 C.F.R. §§ 404.1520(a)(4)(iii) and 416.920(a)(4)(iii)).  An ALJ must compare the claimant's medical evidence with the requirements of listed impairments when considering whether the claimant's impairment or combination of impairments is equivalent in severity to any listed impairment.  *Id.* at 415; *Hunter v. Astrue*, No. 1:09-cv-2790, 2011 WL 6440762, at *3 (N.D. Ohio Dec. 20, 2011); *May v. Astrue*, No. 4:10-cv-1533, 2011 WL 3490186, at *8-9 (N.D. Ohio June 1, 2011).  Nevertheless, it is the claimant's burden to show that he meets or medically equals[4] an impairment in the

---

4.02 and 4.04.  (Plaintiff's Reply ("Pl.'s Reply") at 1.)

[4]  A claimant may be found disabled if her impairment is the *medical equivalent* of a listing.  20 CFR §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  This means that the impairment is "at least equal in severity and duration to the criteria of any listed impairment."  20 CFR § 416.926(a); 20 CFR § 404.1526(a).  An ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any listed impairment.  *Cf. Lawson v. Comm'r of Soc. Sec.*, 192 Fed.Appx. 521, 529 (6th Cir. 2006) (upholding ALJ who "compar[ed] the medical evidence of Lawson's impairments with the requirements for listed impairments contained in the SSA regulations").

Listings. *Evans v. Sec'y of Health & Human Servs.*, 820 F.2d 161, 164 (6th Cir. 1987)

(per curiam).

Listing 4.02 describes chronic heart failure.  *See* 20 C.F.R. Pt. 404, Subpt.

404, App. 1, 4.02.  Plaintiff contends that he satisfies the requirements of Listing 4.02,

which requires:

> Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
>
> 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or
>
> 3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:
>
>> a. Dyspnea, fatigue, palpitations, or chest discomfort; or

14

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

*Id.*

Plaintiff argues that he meets the criteria for Listing 4.02 because he had ejection fraction rates that satisfied the requirements under Paragraph A.   Indeed, the Commissioner concedes that Plaintiff's ejection fraction rates satisfy the requirements of Paragraph A of Listing 4.02.  (Defendant's Brief ("Def.'s Br.") at 13.)  With regard to Paragraph B of Listing 4.02, Plaintiff maintains that he meets the requirements of Listing 4.02(B)(1) because in February 2012, Plaintiff's cardiologist, Dr. Dolsey, determined that Plaintiff should undergo a nuclear stress test rather than a treadmill stress test to evaluate for any evidence of ischemia.  (Tr. 1005.)  Plaintiff maintains that  Dr. Dolsey "presumptively weighed the pros and cons of which test is more definitive and which test is less risky to Plaintiff."  (Pl.'s Reply at 4.)  While it is true that Dr. Dolsey ordered a nuclear stress test rather than a treadmill stress test, there is no indication in the record that Dr. Dolsey found that an exercise test would present a significant risk to Plaintiff. Plaintiff concludes, without explanation, that "Dr. Dolsey clearly did not want Plaintiff doing a regular stress test."  (*Id.*)  Plaintiff's counsel's mere presumption of Dr. Dolsey's intentions, without support from Dr. Dolsey's treatment notes, is not sufficient to show that

15

Plaintiff met the requirements of Listing 4.02(B)(1).  As Plaintiff has not attempted to show that he satisfies the requirements of subsections 2 or 3 of Paragraph B, he has failed to meet his burden of proving that he meets or equals Listing 4.02.

Plaintiff also loosely argues that he is disabled under Listing 4.04, which requires:

Ischemic heart disease, with symptoms due to myocardial ischemia, as described in 4.00E3–4.00E7, while on a regimen of prescribed treatment (see 4.00B3 if there is no regimen of prescribed treatment), with one of the following:

A. Sign-or symptom-limited exercise tolerance test demonstrating at least one of the following manifestations at a workload equivalent to 5 METs or less:

1. Horizontal or downsloping depression, in the absence of digitalis glycoside treatment or hypokalemia, of the ST segment of at least -0.10 millivolts (–1.0 mm) in at least 3 consecutive complexes that are on a level baseline in any lead other than aVR, and depression of at least -0.10 millivolts lasting for at least 1 minute of recovery; or

2. At least 0.1 millivolt (1 mm) ST elevation above resting baseline in non-infarct leads during both exercise and 1 or more minutes of recovery; or

3. Decrease of 10 mm Hg or more in systolic pressure below the baseline blood pressure or the preceding systolic pressure measured during exercise (see 4.00E9e) due to left ventricular dysfunction, despite an increase in workload; or

4. Documented ischemia at an exercise level equivalent to 5 METs or less on appropriate medically acceptable imaging, such as radionuclide perfusion scans or stress echocardiography.

OR

B. Three separate ischemic episodes, each requiring revascularization or not amenable to revascularization (see 4.00E9f), within a consecutive 12–month period (see 4.00A3e).

OR

C. Coronary artery disease, demonstrated by angiography (obtained

16

independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present a significant risk to the individual, with both 1 and 2:

1. Angiographic evidence showing:

a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or

b. 70 percent or more narrowing of another nonbypassed coronary artery; or

c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or

d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or

e. 70 percent or more narrowing of a bypass graft vessel; and

2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 4.04.

The ALJ concluded that Plaintiff's heart disease did not meet or medically equal Listing 4.04 because "it is not attended by the requisite exercise test scores, severely diminished left ventricular ejection fraction, or angiographic evidence of severe stenosis or obstruction of the coronary arteries." (Tr. 53.) Plaintiff argues that, contrary to the ALJ's finding, he satisfies the requirements of Listing 4.04 because he had ejection fraction rates of less than 30%. As the Commissioner notes in her Brief, however, such a showing is not a requirement for Listing 4.04. Moreover, while Plaintiff provides several citations to Plaintiff's treatment records, he fails to explain how those records show that Plaintiff satisfied the criteria for Listing 4.04. (Pl.'s Br. 14-16.) As Plaintiff's

17

reliance on his ejection fraction rates of 30 percent or less is insufficient to show that he met the criteria for Listing 4.04, Plaintiff has not met his burden of showing that he is disabled pursuant to that Listing.

### b. Rheumatoid Arthritis

Plaintiff argues that the ALJ "ignored" his rheumatoid arthritis.  (Pl.'s Br. 18.)  This argument has no merit.  The ALJ found that Plaintiff's rheumatoid arthritis was a severe impairment that limited his ability to perform basic work activities.  (Tr. 52.)  Furthermore, throughout the sequential evaluation process, the ALJ considered the evidence related to Plaintiff's rheumatoid arthritis and accounted for that condition by limiting Plaintiff to a limited range of light work.  The ALJ explicitly acknowledged Plaintiff's testimony that he had surgery on his left knee, was on multiple medications, had no stamina, had trouble getting in and out of the bath tub, and became winded easily.  (Tr. 56.)  The ALJ also noted Plaintiff's allegations that his impairments were getting worse; he could not bend his knees; he found it painful to walk or sit for a long period of time; he cared less about his hygiene and wore the same clothes frequently; and he did not go anywhere.  (*Id.*)  Furthermore, the ALJ acknowledged that Plaintiff was receiving care from Dr. Goldberger since March 2012 for his rheumatoid arthritis.  (Tr. 58.)  The ALJ summarized the treatment records related to Plaintiff's rheumatoid arthritis and concluded that "although the claimant's rheumatoid arthritis may be stable with medication, it still causes the claimant some functional limitations, but the claimant's residual functional capacity fully accommodates for all of the claimant's work-related restrictions."  (Tr. 59.)  Thus, the ALJ did not "ignore" Plaintiff's

18

rheumatoid arthritis as Plaintiff contends; rather, he considered the condition and

accounted for its limitations in Plaintiff's residual functional capacity (RFC).

Plaintiff also contends that his rheumatoid arthritis satisfied Listing 14.09A.

(Pl.'s Br. 20.) Listing 14.09A requires persistent inflammation or persistent deformity

of:

> 1. One or more peripheral weight-bearing joints resulting in the inability to
> ambulate effectively (as defined in 14.00C6); or
>
> 2. One or more major peripheral joints in each upper extremity resulting
> in the inability to perform fine and gross movements effectively (as defined
> in 14.00C7).

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 14.09A. The ALJ properly concluded that

Plaintiff did not satisfy Listing 14.09A. (Tr. 53-54.) The regulations define an "inability

to ambulate effectively" as:

> [A]n extreme limitation of the ability to walk; i.e., an impairment(s) that
> interferes very seriously with the individual's ability to independently initiate,
> sustain, or complete activities. Ineffective ambulation is defined generally as
> having insufficient lower extremity functioning to permit independent
> ambulation without the use of a hand-held assistive device(s) that limits the
> functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.00B(2)(b). Here, Plaintiff has failed to show

such significant restrictions on his ability to ambulate. While Plaintiff testified that it

was "suggested" that he use a cane, he admitted that he did not use an ambulatory

aid. (Tr. 83.) As Plaintiff has not presented evidence showing that he required the use

of a hand-held assistive device that would limit the functioning of both hands or arms,

he has failed to satisfy the first prong of Listing 14.09A.

Additionally, Plaintiff has failed to show that his impairment resulted in an

inability to perform fine and gross movements in his hands. An inability to perform fine and gross movements means:

> [A]n extreme loss of function of both upper extremities; i.e., an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. To use their upper extremities effectively, individuals must be capable of sustaining such functions as reaching, pushing, pulling, grasping, and fingering to be able to carry out activities of daily living. Therefore, examples of inability to perform fine and gross movements effectively include, but are not limited to, the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level.

20 C.F.R. Pt. 404, Subpt. 404, App. 1, 1.00B(2)(c). While Plaintiff complained of numbness in his hands and testified that he often dropped things, he has not shown that his impairments rose to the level contemplated by the regulations. Plaintiff testified that he cooked, made the bed, did laundry, and bathed himself. (Tr. 54.) Accordingly, Plaintiff has failed to show that he met the requirements of Listing 14.09A.

### c. Musculoskeletal Impairment

Finally, Plaintiff maintains that he meets the "musculoskeletal listings of 1.02 and 1.04." (Pl.'s Br. at 19.) While Plaintiff raises this issue, he includes no legal support for his argument, as he does not cite to any case law or regulations that would help guide this Court in analyzing the issue. Instead, Plaintiff offers a string of factual allegations followed by unsupported conclusions. Indeed, Plaintiff does not even cite Listings 1.02 or 1.04 or paraphrase their requirements. Without reference to case law or regulations supporting Plaintiff's assertions, this Court cannot properly determine whether or not Plaintiff's argument regarding Listings 1.02 or 1.04 has any merit. As a result of failing to explain, develop, or provide an analytical framework for this assigned

error, Plaintiff has waived any argument on this point.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995–996 (6th Cir.1997)).

### 2. The ALJ Erred in Evaluating the Opinion of Plaintiff's Treating Psychiatrist, Dr. LaForrest.

Plaintiff argues that the ALJ erred in failing to give controlling weight to the December 2012 opinion of Plaintiff's treating psychiatrist, Dr. LaForrest.  (Tr. 1014-1017.)  Dr. LaForrest opined, in part, that Plaintiff had marked limitations in his ability to maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  The ALJ addressed Dr. LaForrest's opinion in his hearing decision:

> The undersigned affords great weight to Dr. LaForrest's opinions regarding the claimant's mild and moderate work-restrictions because they [sic] medical record as a whole fully supports a finding that he [sic] claimant has some mental limitations.  However, the marked limitations opined by Dr. Laforrest [sic] are given little weight because they are inconsistent with the clinical findings, the GAF scores of 55, the claimant's activities of daily living, and the medical record as a whole.

(Tr. 60.)  Plaintiff argues that the ALJ failed to provide good reasons for rejecting Dr. LaForrest's opinion that Plaintiff had some marked limitations with regard to his mental condition.

21

"An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted).  If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight.  *See Wilson,* 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)).  This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.,* 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted).  Where an ALJ fails to explain her reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand.  *Id.*

The ALJ did not err in assigning less than controlling weight to part of Dr. LaForrest's opinion, as he provided "good reasons" for doing so.  In assigning little weight to the marked limitations opined by Dr. LaForrest, the ALJ noted that the finding of marked limitations was inconsistent with the clinical findings, the GAF scores of 55, Plaintiff's activities of daily living, and the medical record as a whole.  (Tr. 60.)  If this were all the ALJ had said about the evidence, the case may require remand.[5]

---

[5]  There is case law supporting the general proposition that an ALJ's broad statement rejecting a treating physician's opinion without giving specific reasons for

In this case, however, the ALJ's opinion, taken as a whole, thoroughly evaluates the evidence and indicates the weight the ALJ gave it.  This provides a sufficient basis for the ALJ's rejection of part of Dr. LaForrest's opinion, *see Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470-71 (6th Cir. 2006), and affords this Court the opportunity to meaningfully review the ALJ's opinion.  In *Nelson*, the ALJ failed to discuss the opinions of two of the plaintiff's treating physicians, and the plaintiff argued that this failure constituted a basis for remand.  The Sixth Circuit disagreed, concluding that "the ALJ's evaluation of [the plaintiff's] mental impairments indirectly attacks both the supportability of [the treating physicians'] opinions and the consistency of those opinions with the rest of the record evidence."  195 F. App'x at 470.  Because the ALJ's discussion of the other evidence "implicitly provided sufficient reasons for not giving . . . controlling weight" to the treating physicians, the Sixth Circuit concluded that the ALJ's decision satisfied the purposes of the controlling physician rule.  *Id.* at 472.

In this case, the ALJ provided a lengthy discussion of the medical evidence before evaluating the opinions of the treating physicians and the other medical opinions contained in Plaintiff's record.  (Tr. 55-60.)  The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather, the ALJ analyzed the medical evidence and explained how it supported his

_____

rejecting it requires remand.  *See Wilson*, 378 F.3d at 545 (finding that the ALJ's "summary dismissal" of the opinion of the claimant's treating physician failed to satisfy the "good reasons" requirement); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Put simply, it is not enough to dismiss the treating physician's opinion as incompatible with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick.").

ultimate RFC determination.  (*Id.*)  For example, the ALJ discussed the following evidence, which implicitly rejects Dr. LaForrest's opinion that Plaintiff had marked mental limitations:

- Plaintiff's daily activities included adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for grooming and hygiene, using telephones and directories, and using a post office. (Tr. 54.)  Plaintiff testified that he cooked, made the bed, did laundry, bathed, watched television, and read internet news.  (*Id.*)

- The ALJ acknowledged Plaintiff's testimony that he had difficulty focusing, concentrating, and completing tasks. (Tr. 54.)  Plaintiff also testified, however, that he could cook and do some household chores, follow movies, watch television, and read internet news.  (*Id.*)  The ALJ further acknowledged that Plaintiff "exhibited sufficient concentration and pace to answer questions during the hearing." (*Id.*)

- The ALJ noted that although Plaintiff has received various forms of treatment for his allegedly disabling symptoms, including psychotropic medication and mental health counseling, the record also reveals that the treatment has been generally successful in controlling those symptoms.  (Tr. 57.)  Plaintiff was prescribed Zoloft, Lexapro, and Trileptal, and according to treatment notes, they reduced Plaintiff's symptoms.  (Tr. 59.)

- The ALJ observed that "[i]t was noted that the claimant exhibited anxiety, irritability, a depressed mood, impulsivity, mood swings, and sleep problems, but it was noted that the claimant had no psychomotor agitations, he had average intelligence, he was articulate and coherent, his thought process was organized and goal directed, and there was no over delusion thinking.  Furthermore, the claimant denied hallucinations, suicidal ideations, and homicidal ideations, he was fully oriented, no significant memory difficulties were noted, and he recognized his need for help and was willing to participate in treatment."  (Tr. 59.)

- As of September 12, 2012, Plaintiff noted that he was compliant with medication and he denied side effects. (Tr. 59.)  It was noted that his affect was full and his thought process was still goal directed.  (*Id.*)

- The ALJ observed that Plaintiff was assessed with GAF scores of 55,

which indicate no more than moderate limitations in social, occupational, and school functioning.[6] (Tr. 59.)

Had the ALJ discussed the aforementioned evidence immediately after stating that he was rejecting Dr. LaForrest's assessment of marked limitations, there would be no question that the ALJ provided "good reasons" for giving little weight to part of Dr. LaForrest's opinion. The fact that the ALJ did not analyze the medical evidence for a second time (or refer to his previous analysis) when rejecting the opinion does not necessitate remand of Plaintiff's case. "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)). *See also Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004) (When "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game.") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n.6 (1969)). Accordingly, Plaintiff's second assignment of error is without merit.

## VI.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

---

[6] Plaintiff argues that the ALJ improperly relied on Plaintiff's GAF score of 55 to discount Dr. LaForrest's opinion. This argument is not well taken. While a GAF score, alone, is not dispositive of an individual's functional abilities, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir.2002), there is no indication here that the ALJ rejected Dr. LaForrest's marked limitations solely because Plaintiff had a GAF score that indicated moderate limitations. Rather, Plaintiff's GAF score was just one of the many factors the ALJ considered in determining the weight to afford Dr. LaForrest's opinion.

Commissioner's final decision be AFFIRMED.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: August 19, 2015

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**